**LAW OFFICES OF**
**DONNA R. NEWMAN**
ATTORNEY AT LAW
20 VESEY STREET, SUITE 400
NEW YORK, NEW YORK 10007
TEL. 212-229-1516
FAX 212-676-7497
DONNANEWMANLAW@AOL.COM
MEMBER: N.Y. & N.J. BAR

June 29, 2023

Honorable Colleen McMahon
United States District Judge
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007

Re: *United States v. Sabitri Laforest*, 21-CR-272 (CM)

Dear Judge McMahon:

There is nothing that Sabitri Laforest would not do for her family. Yet, at the age of 61, largely due to her misguided actions in service to that dedication, she comes before the Court for sentencing in a case that will result in her removal from the United States, and her permanent separation from her husband, children, and grandchildren. She will miss everything that her family experiences in the United States -- graduations, birthdays, school functions, family dinners and holiday celebrations. She will lose the ability to maintain regular, in-person contact with those dearest to her heart, the ones for whom she sacrificed for decades. That Ms. Laforest brought this tragedy on herself must be acknowledged. But knowing that one has caused one's own downfall makes the lived experience more, not less, painful. Ms. Laforest lives every day with regret, just as she will live the rest of her life.

As she writes to the Court, "The consequence of my action creates unbearable pain and it is overwhelming. I am guilty. Now my family and I face jail time. We are about to lose everything. Our lives together are falling apart. . . . Jail time and deportation is the greatest punishment of all. . . . Most of all I cherished my family, my children. I will not be there to care for them. . . . I am so sorry that they have to endure this punishment. I will miss my children, grandchildren, most of all they will miss me." Exhibit A, Letter from Sabitri Laforest.

Probation suggests a sentence of 63 months, the low end of the applicable Guidelines range calculated in the PSR. See Presentence Report ("PSR") at pg. 31 (Sentence Recommendation

1

["SR"]). Probation notes that this offense is Ms. Laforest's first conviction; that she is married and the mother to five adult children and a 17-year-old stepdaughter; and that she is the caretaker for her 89-year-old mother-in-law "who resides with her and [the] family and suffers from a neuromuscular disorder, Myasthenia Gravis." *Id.*, at p. 31-32. Nonetheless, the PSR finds that the loss caused by Ms. Laforest's conduct and the resulting Guidelines range of 63-78 months merit a substantial sentence. *Id.*

Because Ms. Laforest faces a lifetime of punishment after her deportation to Guyana, a country she left at the age of 14, and to which she has no remaining connection (the rest of her family members are United States citizens), the Defense submits that a term of incarceration below the Guidelines range would more appropriately serve each of the goals of sentencing and that even a Guidelines sentence at the bottom of the range is unnecessarily harsh.

## LEGAL STANDARD FOR SENTENCING

The Court is directed to impose a sentence that (A) reflects the seriousness of the offense, promotes respect for the law and provides just punishment for the offense, (B) affords adequate deterrence to criminal conduct; (C) protects the public from further crimes of the defendant; and (D) provides the defendant with needed education or vocational training, [and] medical care. 18 U.S.C. § 3553(a)(2). The Supreme Court's decisions in *Kimbrough v. United States*, 552 U.S. 38 (2007) and *Gall v. United States*, 552 U.S. 38 (2007), make clear that this Court has full authority to consider any evidence it wants in deciding whether or not the guidelines "properly reflect § 3553 considerations[.]" *Rita v. United States*, 127 S. Ct. 2456, 2468 (2007).

In reaching an appropriate sentence, "no limitation shall be placed on the information concerning the background, character, and conduct of [the defendant] which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661. *See also United States v. Sattar*, 2012 WL 2434760, at *10 (2d Cir. 2012). Above all, sentencing must be individualized. *Pepper v. United States*, 562 U.S. 476, 487–88 (2011). *See also Williams v. People of State of N.Y.*, 337 U.S. 241, 247 (1949) ("[T]he punishment should fit the offender and not merely the crime."). We focus this memorandum, therefore, on the history and characteristics of Ms. Laforest that support our request for a minimal term of incarceration.

## HISTORY AND CHARACTERISTICS OF SABITRI LAFOREST

When Ms. Laforest was 18 years old, she introduced her family to the man who would become her husband, Garry Laforest. But because Mr. Laforest's skin was black (darker than her own), Ms. Laforest's family refused to accept him and her mother disowned her. Although Ms. Laforest's mother lives nearby, she and Ms. Laforest have not had contact for over 40 years. Cut off from her birth family, Ms. Laforest turned all of her energy to creating a new family with Mr. Laforest – a family that she would protect and maintain at all costs.

Thus, when Mr. Laforest's extramarital affair resulted in the birth of a child, Ms. Laforest not only accepted her husband's transgression; she took in the child, a daughter who is now 17 years old, and raised her as her own. She maxed out credit cards paying for private school tuition for

2

the children. She paid for their expenses – needs and wants – freely, almost profligately, as if money could buy her the certainty that this family would never abandon her.

Letters submitted on Ms. Laforest's behalf call her "a dedicated wife to her husband and a doting mother to her children" (Exhibit B, Letter from Nadege Desir), "a kind person, understanding and family oriented" (Exhibit B, Letter from Lia Vigne-Bernadotte), a "nurturing mother to her children, the perfect wife to her husband, Garry and a family pillar" (Exhibit B, Letter from Belinda Pierre-Louis), and "the heart and soul of her family" (Exhibit B, Letter from Marcia Turnier). *See also* Exhibit B, Letter from Valery Juste (calling Ms. Laforest "a good mother and a wonderful wife.").[1]

At the same time, Ms. Laforest sought to expand her circle of caring. She adopted her husband's charitable cause, donating time, money, and food to build and support social programs in Haiti. The Reverend Alfred Mombeleur describes the Laforest family's multi-year commitment to families in Torbec, Haiti, which "provided the needed assistance to clothe feed and shelter poor Haitian families who were living on the streets of Torbec." Exhibit B, Letter from Rev. Alfred Mombeleur. They "made a truck and four SUVs available to several mayors and other public servants in Haiti to make sure the poor people of Haiti specially the elderly and women's ready to deliver their babies can reach the hospitals on time without difficulties." *Id.* They "established a school in Camp Coq, they helped the poor people of Archaie to also build a small building to worship and organize school activities." *Id.* They came back year after year. *Id.*

With each of the family's frequent visits to Haiti, Ms. Laforest bought rice, beans, and meat to cook for the students and the teachers at the school they had established. In pictures attached hereto as Exhibit C, the joy caused by Ms. Laforest's generosity is evident.

The Laforest family's school created a place where children could learn without having to pay what might, in the state school system, have been prohibitive tuition. The family's generosity brought nutrition and stability to some of the residents of one of the most unstable, and poorest countries in the Western hemisphere. And Ms. Laforest did it not for recognition, but because of the warmth and community she experienced with the Haitian families for whom she had come to care deeply and because she knew how much this cause mattered to her husband.

Back in the United States, Ms. Laforest worked for years as the controller – essentially a glorified bookkeeper -- for Atlas Acon Electric Service Company ("Acon"), starting in 1986. She worked long hours – at least 60 hours per week, and sometimes 13 hours per day. In spite of her dedication to her family, the work often took over. In 1987, she spent all of one Saturday in the office sending out W-2 forms, while in labor with a son who was born later that night. For a lack of childcare at home, she would often bring the children to the office with her in the evenings, and they would sleep on the floor as she worked. Because she was a dependable employee, many duties fell on Ms. Laforest's shoulders. She oversaw assistants, headed two office locations, and trained employees. Over the 34 years she worked for Acon, she received very small incremental increases in her salary-at the beginning just $25 addition each week, despite the long hours she

---

[1] Letters from friends and acquaintances are attached as Exhibit B, organized in the same sequence that they are referenced herein.

3

worked. By 2016 her gross salary was $180,000[2] and from then on, she received the same salary every year.

After decades receiving only minimal salary increases, feeling that she had to spend money to keep her family happy and content, personal use of company money became normalized in her mind, and Ms. Laforest began to commit the offense for which she will be sentenced. Ms. Laforest understands that her actions were wrong. She has also taken her obligation to make amends through payment of forfeiture and restitution seriously. She has a tentative contract to sell her Florida house and the proceeds will be paid toward her forfeiture obligation. Acon has confiscated her pension (worth approximately $700,000 as of 2020) in partial satisfaction of her restitution obligation as well.[3]

Now, Ms. Laforest stands before the Court for sentencing. She knows that she committed a crime, and she will live every day with the consequences of her decision. She writes to the Court, "I apologize to Atlas-Acon for misusing their trust in me and defrauding them of millions of dollars. I know that my apology will not be enough to make this action better. I want you to know how sorry I am. . . .  There is no justification for my action. . . . I feel ashamed and remorseful . . ." Exhibit A.

Her friends describe her as "deeply ashamed of her actions, and heart-broken over the pain that she has caused." Exhibit B, Letter from Marcia Turnier. "She is broken inside because of the pain that she has caused and is causing to everybody involved." Exhibit B, Letter from Stephane T. Gibbons. She asks the Court to impose a sentence less than the applicable Guidelines range, understanding that her true punishment, separation from her family, will continue for the rest of her life.

## OFFENSE CONDUCT

Ms. Laforest admits that, for years, she used funds from Acon to pay her family's personal American Express bills. She offers no justification for her conduct, but explains that she had overextended herself financially, that her husband's restaurant ventures failed to thrive, and that she realized her role at Acon provided her with access to the money that promised to solve these concerns. With the overwhelming need to keep her family happy and secure, Ms. Laforest took advantage of her position and her late hours alone in the office to commit the crime for which she will be sentenced. She writes, "I was blinded in helping my family. I was wrong, my actions are inexcusable." Exhibit A.

---

[2] Of note, in 2023, the average salary paid to a controller in New York in 2023 was $288,888 but the range typically falls between $242,941 and $338,897. https://www.salary.com/research/salary/benchmark/controller-salary/new-york-ny. Needless to say, the larger the company, the higher the controller's compensation.

[3] In addition, American Express refunded approximately $6.5 million to Acon in 2020 as a result of the investigation and prosecution of this case. Ms. Laforest recognizes that this does not affect the loss amount for Guidelines purposes. It does, however, mitigate the damage to Acon's bottom line from her offense conduct and the restitution owed.

## A VARIANCE IS WARRANTED FROM THE ADVISORY GUIDELINES RANGE

The Guidelines calculation in the plea agreement and in the PSR is driven in substantial part by the 20-point increase to the base offense level of 7 for a loss between $9.5 million and $25 million. After addition of two points for abuse of a position of private trust or use of a special skill (USSG § 3B1.3) and subtraction of three points for timely acceptance of responsibility (USSG § 3E1.1), Ms. Laforest faces a total offense level of 26 which corresponds to a Guidelines range (CHC I) of 63-78 months of imprisonment.

The driving force behind Ms. Laforest's advisory guideline range, is the 20-level increase under USSG § 2B1.1. But this 20-point increase has no talismanic significance, nor is the Court bound to sentence Ms. Laforest based upon it. To the contrary, courts have criticized using the Sentencing Guidelines' loss enhancement table in USSG § 2B1.1 as a proxy for determining the appropriate sentence.

The Guidelines' loss enhancement table in USSG § 2B1.1 was developed "without the benefit of empirical study of actual fraud sentences by the Sentencing Commission." *United States v. Corsey*, 723 F.3d 366, 380 (2d Cir. 2013) (Underhill, J. concurring); *see also United States v. Musgrave*, 647 F. App'x 529, 538-39 (6th Cir. May 4, 2016) ("there is reason to believe that, because the loss Guidelines were not developed using an empirical approach based on data about past sentencing practices, it is particularly appropriate for variances").

The consequence of the loss enhancement lacking an empirical basis, combined with the often-disproportionate role that loss plays in determining the Guidelines sentence, is that "sentencing judges are discouraged from undertaking close examination of the circumstances of the offense and the background and characteristics of the offender." *Corsey*, 723 F.3d at 380 (Underhill, J. concurring). The result is often an unjust sentence. As Justice Gerald Lynch, now of the Second Circuit, explained the danger of blind adherence to the § 2B1.1 loss calculation:

> The Guidelines place undue weight on the amount of loss involved in the fraud. This is certainly a relevant sentencing factor: All else being equal, large thefts damage society more than small ones, create a greater temptation for potential offenders, and thus generally require greater deterrence and more serious punishment. But the guidelines provisions for theft and fraud place excessive weight on this single factor, attempting—no doubt in an effort to fit the infinite variations on the theme of greed into a limited set of narrow sentencing boxes—to assign precise weights to the theft of different dollar amounts. In many cases, including this one, the amount stolen is a relatively weak indicator.

*United States v. Emmenegger*, 329 F.Supp.2d 416, 427 (S.D.N.Y. 2004).

Here, the 20-level increase for a loss between $9.5 million and $25 million to Ms. Laforest's base offense level drives up her advisory Guidelines sentencing range to 63-78 months (as per the PSR). But there is no reason that an increase instead of, for example, 10 levels would not adequately reflect the gravity of the offense. In short, the Court should consider that while the loss was substantial, her sentence should be based on more than loss alone. We suggest that the

5

Court can and should consider the loss table's flaws and vary from Ms. Laforest's advisory Guidelines range.

### THE COURT SHOULD LOWER MS. LAFOREST'S ADVISORY GUIDELINES BY TWO LEVELS IN CONSIDERATION OF THE SENTENCING COMMISSION'S PROPOSED AMENDMENT TO THE GUIDELINES FOR FIRST-TIME OFFENDERS.

The Sentencing Commission has proposed an amendment to the 2023 Guidelines Manual (proposed § 4C1.1) that would, if adopted in November 2023, as anticipated, provide a two-level decrease from the otherwise applicable Guidelines range for certain offenders with zero criminal history points.[4],[5] Ms. Laforest, who faces her first conviction and sentence at the age of 61, has no criminal history points. If Ms. Laforest were granted the additional reduction, she would face a range of 51-63 months of imprisonment (CHC I, level 24).

### THE COURT SHOULD CONSIDER A SPLIT SENTENCE.

Title 18 U.S.C. § 3583(e)(4) permits the Court to order home confinement as a condition of supervised release after imprisonment "as an alternative to incarceration." *See also* 18 U.S.C. § 3563(b)(19) (stating that home confinement during nonworking hours may be imposed as a condition of a sentence of probation "only as an alternative to incarceration"). The Guidelines incorporate the possibility that "Home detention may be imposed as a condition of probation or supervised release, but only as a substitute for imprisonment." USSG § 5F1.2. Home confinement is "custody" for sentencing purposes. *See*, *e.g.*, *United States v. Lopez-Pastrana*,

---

[4] New §4C1.1 would provide a decrease of 2 levels from the offense level determined under Chapters Two and Three if the defendant meets all of the following criteria: (1) the defendant did not receive any criminal history points from Chapter Four, Part A; (2) the defendant did not receive an adjustment under §3A1.4 (Terrorism); (3) the defendant did not use violence or credible threats of violence in connection with the offense; (4) the offense did not result in death or serious bodily injury; (5) the instant offense of conviction is not a sex offense; (6) the defendant did not personally cause substantial financial hardship; (7) the defendant did not possess, receive, purchase, transport, transfer, sell, or otherwise dispose of a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense; (8) the instant offense of conviction is not covered by §2H1.1 (Offenses Involving Individual Rights); (9) the defendant did not receive an adjustment under §3A1.1 (Hate Crime Motivation or Vulnerable Victim) or §3A1.5 (Serious Human Rights Offense); and (10) the defendant did not receive an adjustment under §3B1.1 (Aggravating Role) and was not engaged in a continuing criminal enterprise, as defined in 21 U.S.C. § 848.

[5] Although the dollar amount of the loss caused by Ms. Laforest's conduct is substantial, the loss was spread out over a period of years and did not cause Acon, a company with an annual estimated revenue between $25 million and $100 million (according to https://www.signalhire.com/companies/atlas-acon-electric-service-corp) substantial harm. Ms. Laforest advises that Acon's earnings were well in excess of 100 million dollars a year for approximately the last ten years. The lack of effect on Acon's financial stability is made plain by the fact that Acon was unaware of the fraud until American Express notified them that Ms. Laforest's credit card bills were being paid using the company account. See PSR at ¶ 12.

889 F.3d 13 (1st Cir. 2018); *United States v. Floss*, 42 F.4th 854 (8th Cir. 2022); *United States v. Tourloukis*, 558 Fed. App'x 112 (2d Cir. 2014) (noting cases that hold the term of home confinement and term of imprisonment in a BOP facility, when added together, cannot exceed the maximum allowable term of imprisonment).

Thus, even for an offender such as Ms. Laforest, whose sentencing range falls within Zone D of the Guidelines Sentencing Table, the Court may impose a sentence that splits the custodial term between incarceration in a Bureau of Prisons facility and home confinement.

Courts around the country have imposed such sentences. *See*, *e.g.*, *United States v. Bianco*, No. 0:20-CR-60120-PCH (S.D. Fla., Sept. 22, 2021) (imposing a sentence of 24 months in prison followed by 24 months of supervised release with a special condition of home detention, for a total of 48 months in "custody" on a securities fraud defendant who faced a guidelines range of 63-78 months of imprisonment (level 26, CHC I)); *United States v. Prassenos*, No. 3:20-CR-53, 2021 WL 316233, at *1 (E.D. Va. Jan. 29, 2021) (imposing time served, followed by supervised release with a special condition of two years of home confinement on a defendant who faced a guidelines range of 70-87 months, and explaining that "confinement can be served either in prison or at home or in both sites."); *United States v. Pembroke*, No. 09-CR-118, 2011 WL 6122399 (E.D. Wis., Dec. 8, 2011) (imposing a split sentence of six months in prison followed by six months of supervised release with a special condition of home confinement on a defendant who pleaded guilty to wire fraud, in violation of 18 U.S.C. § 1343, and money laundering, in violation of 18 U.S.C. § 1956, arising out of his participation in a mortgage fraud scheme, and faced a Zone D guidelines range of 63-78 months in prison (offense level 22 CHC IV)).

In *United States v. Vargas*, No. 11-CR-240-01, 2012 WL 363120 (S.D.N.Y. Feb. 2, 2012), the defendant pleaded guilty to one count of conspiracy to commit bank fraud, one count of bank fraud, one count of conspiracy to commit money laundering, and one count of money laundering. The defendant had a guidelines sentencing level of 14, with a criminal history of Category I. His guidelines range was 15 to 21 months in prison (Zone D). The Honorable Judge Sweet sentenced Mr. Vargas to time served and three years of supervised release, with the first year under a special condition of home confinement.

The Court is empowered here to similarly fashion a sentence that imposes a term of home confinement as some portion of the custodial term, in satisfaction of the parsimony clause of 18 U.S.C. § 3553(a).

### A SPLIT SENTENCE AND/OR A DOWNWARD VARIANCE WOULD BE SUFFICIENT TO SERVE EACH OF THE GOALS OF SENTENCING.

A custodial sentence that includes a term of home confinement and/or a term of imprisonment in a Bureau of Prisons facility no greater than 30 months would be "sufficient, but not greater than necessary" to serve each of the goals of sentencing. *See* 18 U.S.C. § 3553(a). As noted above, Ms. Laforest's most severe punishment will come after she has served her sentence and is deported to Guyana, leaving her family behind. She will experience each lonely day as a punishment for the rest of her life. Under these circumstances, a guidelines sentence of incarceration in a BOP facility is simply unnecessary and would be excessively harsh.

The Sentencing Commission's Interactive Data Analyzer[6] reflects that, for the 18,644 offenders sentenced nationwide between 2017 and 2021 for fraud under § 2B1.1 in CHC I, the average sentence was 19 months and the median sentence was just 9 months. Only 26.1% of offenders with these characteristics received sentences greater than 24 months of imprisonment, while 73.9% received sentences up to 24 months.

Of the 827 female offenders over 60 sentenced during the same timeframe sharing the same offense characteristics, 83.6% received a sentence of less than 24 months of imprisonment, with an average sentence length of 13 months and a median sentence length of 3 months.[7] Considering these statistics, a sentence of imprisonment of 30 months would appropriately reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense.

A non-Guidelines sentence would also provide adequate deterrence, both general and specific. *See Furman v. Georgia*, 408 U.S. 238, 343, 92 S. Ct. 2726, 2779, 33 L. Ed. 2d 346 (1972) ("Our jurisprudence has always accepted deterrence in general, deterrence of individual recidivism, isolation of dangerous persons, and rehabilitation as proper goals of punishment."). "[C]ertainty and promptness of punishment are more powerful deterrents than severity. . . . Imaginable increases in severity of punishments do not yield significant (if any) marginal deterrent effects." Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime and Justice: A Review of Research 28-29 (2006). Indeed, there is little evidence that long prison sentences have a sufficient general deterrent effect to "justify their social and economic costs." Daniel Nagin, "Deterrence in the 21st Century, Crime and Justice in America: 1975-2005," at 201 (ed. Michael Tonry, University of Chicago Press, 2013). A long sentence for Ms. Laforest, therefore, should not be predicated on the need for general deterrence.

Nor does specific deterrence justify a lengthy term of imprisonment here. Ms. Laforest is a first-time offender whose offense was directly tied to a set of circumstances that no longer exist. She has lost the job that enabled her to commit the offense of conviction. She will be deported upon her release from custody. Her family members will no longer expect her to fund their lavish

---

[6] (https://ida.ussc.gov/analytics/saw.dll?Dashboard)

[7] To replicate this data, go to: https://ida.ussc.gov/analytics/saw.dll?Dashboard
Click on Sentencing Outcomes (top center)
Click on Sentence Length (just below Sentencing Outcomes)
Use the filters on the left side to select:
- Fiscal Year = all years between 2017 and 2021
- Crime Type = fraud/theft/embezzlement
- Primary Guideline = 2B1.1
- Criminal History Category = I

This gives the first set of statistics. Then refine by demographics:
- Gender = female
- Age = over 60

This gives the second set of statistics.

lifestyle. She writes to the Court, "The consequence of my action creates unbearable pain and it is overwhelming. I am guilty. . . . Today I face jail time and deportation. Jail time and deportation is the greatest punishment of all. . . . My actions did not help my family, it actually destroyed everything I worked for, so many years. . . I beg for forgiveness." Exhibit A.

For the same reasons – changed circumstances and anticipated deportation --, a 30-month term of imprisonment in BOP custody or a split sentence, as discussed above, would adequately protect the public.

Finally, Ms. Laforest is not in need of education or vocational training, or medical care that she cannot obtain outside of BOP custody.

## CONCLUSION

For the foregoing reasons, we ask the Court to impose a sentence no greater than necessary to comply with the parsimony clause of 18 U.S.C. § 3553(a). We ask the Court to not impose a fine, to order that no interest accrue on the restitution ordered, and we ask the Court to impose a short term of supervised release. We ask the Court to recommend designation to a facility as close to the New York metropolitan area as possible.

We thank the Court for its consideration of this submission.

Respectfully submitted,
    /s/
Donna Newman
Cc: All counsel (by ECF)